UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GCA LEISURE, LLC and<br>TINIAN MANAGEMENT COMPANY, LLC<br><br>Plaintiffs<br><br>v.<br><br>HONG KONG ENTERTAINMENT (OVERSEAS) INVESTMENTS LIMITED and CHINESE STRATEGIC HOLDINGS LIMITED<br><br>Defendants | Civil Action No.<br><br>_____<br><br>**COMPLAINT** |

GCA Leisure, LLC, a New York limited liability company, and Tinian Management Company, LLC, a New York limited liability company, both with principal places of business at 850 Third Avenue, Suite 16C, Borough of Manhattan, County of New York, State of New York, by way of Complaint against Defendant Hong Kong Entertainment (Overseas) Investments Limited and Chinese Strategic Holdings Limited, say as follows:

PARTIES AND JURISDICTION

1. Plaintiff GCA Leisure, LLC ("GCA") is a limited liability company of the State of New York.

2. GCA has its principal place of business at 850 Third Ave., Suite 16C, New York, New York.

3. Tinian Management Company, LLC ("TMC") is a limited liability company of the State of New York and a wholly-owned subsidiary of GCA.

4. Tinian has its principal place of business at 850 Third Ave., Suite 16C, New York, New York.

5. Hong Kong Entertainment (Overseas) Investments Limited ("HKE") is a corporation formed pursuant to the laws of the Northern Mariana Islands.

6. HKE has its principal place of business at One Broadway, PO Box 468, Tinian, MP.

7. The Northern Mariana Islands is a self-governing commonwealth formally known as the "Commonwealth of the Northern Mariana Islands" that is in political union with and under the sovereignty of the United States of America. See 48 U.S.C. § 1801 and the Covenant to Establish the Commonwealth of the Northern Mariana Islands in Political Union with the United States of America.

8. Except as otherwise provided, 28 U.S.C. § 101, et seq. is applicable to the Northern Mariana Islands. See 48 U.S.C. § 1821(c).

9. Chinese Strategic Holdings Limited ("CSHL") is incorporated in Bermuda with limited liability.

10. CSHL's principal place of business located at 2/F, SBI Centre, Nos. 54-58 Des Voeux Road Central, Hong Kong.

11. The subject matter of the case at bar as relates to GCA and HKE is a November 11, 2014 engagement letter ("Engagement Agreement") between them.

12. The amount in dispute pursuant to the Engagement Agreement is in excess of $75,000.00.

13. GCA and HKE are diverse, have met the monetary requirements for diversity and, as such, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

14. The subject matter of the case as bar as relates to TMC and CSHL is a February 22, 2015 management agreement ("Management Agreement") by and between TMC and HKE.

15. TMC is a single purpose entity formed by GCA for the purpose of providing services to HKE in accordance with the Management Agreement.

16. The amount in dispute pursuant to the Management Agreement is in excess of $75,000.00.

17. TMC and CSHL are diverse, have met the monetary requirements for diversity and, as such, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(3).

## VENUE

18. A substantial part of the events or omissions arising out of or related to the Engagement Agreement and Management Agreement that give rise to this Complaint occurred in the Southern District of New York.

19. As such, venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

## FACTS

20. HKE is the owner of a casino/hotel known as the Tinian Dynasty Hotel & Casino ("Casino").

21. The Casino is located at One Broadway, Tinian, Northern Mariana Islands.

22. The suitability of HKE to own and operate the Casino was questioned by the Tinian Casino Gaming Control Commission ("Commission") as a result of certain financial irregularities.

23. As a result of the Commission's concerns, and investigations by various federal authorities, HKE executed the Engagement Agreement.

24. The Engagement Agreement provided that GCA would represent HKE, and its affiliated entities, (hereinafter collectively referred to as "HKE") in an application

("Application") to the Commission for a determination of suitability to own and operate the Casino.

25. GCA was to provide the following specific services pursuant to the Engagement Agreement: (1) advise and assist HKE in connection with matters referenced in a letter dated October 22, 2014 from the Commission to HKE, and others, including, without limitation, all corporate planning and compliance matters necessary to satisfy the matters set forth in the aforementioned letter, and the preparation and execution of the relevant primary and ancillary documentation relating thereto; (2) advise and assist HKE with respect to its ownership structure and capitalization and its management structure and personnel; (3) advise and assist HKE in restructuring its existing financing structure and, if necessary, seek, negotiate, and document additional financing as may be required; (4) represent HKE before the relevant regulatory bodies including, but not limited to, the Commission; (5) support and work with HKE in developing and executing a general and specific strategy for accomplishing its goals and objectives; and (6) coordinate the efforts and activities of other advisors and consultants retained by HKE to achieve its goals in the most effective and efficient manner possible.

26. GCA performed the services contemplated by the Engagement Agreement.

27. The Engagement Agreement specified an hourly rate at which Plaintiff would charge for services rendered pursuant to the Engagement Agreement: senior team members would be billed at $575/hour (which represents a substantial discount from GCA's customary hourly rates); GCA associates and staff would be billed at rates ranging between $90/hour and $350/hour.

28. The Engagement Agreement also provided for the reimbursement of GCA's expenses.

29. The Engagement Agreement required a retainer of $50,000.00; half of the retainer would be applied to the initial bills pursuant to the Engagement Agreement; the remaining half of the retainer would be applied to the final bills pursuant to the Engagement Agreement.

30. The Engagement Agreement also contemplated a success fee upon a finding of suitability of HKE by the Commission.

31. The Engagement Agreement further provided that it was to be governed by New York law.

32. GCA performed services and incurred expenses under the Engagement Letter, and rendered monthly invoices to HKE. HKE paid the invoices in part; therefore monies remain due and owing from HKE to GCA.

33. On January 21, 2015, a third party vendor that provided consulting and investigative services for the Commission produced an Executive Summary Report ("Executive Summary") of an operational review of the Casino conducted in December 2014, noting various deficiencies related to the ownership and operation of the Casino. The Executive Director of the Commission transmitted this to HKE and its representatives, who in turn transmitted it to GCA.

34. Subsequent to the Executive Summary, on January 26-27, 2015, in Seattle, Washington, the Commission met with representatives and counsel for HKE in order to address the ongoing issues relating to HKE's suitability to own and operate the Casino (the "Seattle Summit").

35. The Seattle Summit was attended, additionally, by representatives of GCA, representatives of CSHL, and the third party vendor that provided consulting and investigative services for the Commission relating to the Casino.

36. Throughout the Seattle Summit, HKE would not undertake any activity or otherwise commit itself without the participation and consent of CSHL, who, at that time, was a creditor of HKE in connection with the Casino and was in ongoing discussions with HKE relating to potential strategic transactions relating to the Casino, including without limitation, potential transaction structures that would result in CSHL taking control of the Casino.

37. Pursuant to the demands of the Commission, HKE was required to enter into a management agreement ("Management Agreement") as relates to the Casino. The material terms of the Management Agreement were negotiated in break-out sessions during the Seattle Summit, with participation by GCA, HKE and its representatives, and CSHL and its representatives. At the Seattle Summit, HKE's outside counsel presented the material terms to the Commission, which offered its approval that there was an acceptable basis for agreement.

38. In the weeks following the Seattle Summit, drafts of a written Management Agreement, embodying the terms agreed upon during the Seattle Summit, were circulated for comments. Representatives of CSHL were copied on the drafts, reviewed same and communicated to the working group that they were discussing the drafts with HKE and its representatives. It was the understanding and belief of the Plaintiffs that HKE would only sign off on the Management Agreement with CSHL's consent.

39. The Management Agreement, with the acquiescence and approval of CSHL, was executed between HKE and TMC on February 22, 2015.

40. TMC was to provide the following non-exclusive listing of services pursuant to the Management Agreement: (1) diligently observe, assess, advise, consult and plan regarding the needs of HKE and the Casino; (2) give advice regarding the implementation of plans for the Casino; and (3) potentially manage and operate the Casino on behalf of HKE.

41. The Management Agreement provided that HKE appointed TMC as HKE's agent to observe, assess, advise, consult and plan, regarding the needs of HKE and the Casino, and, as appropriate, advise regarding the implementation of plans and to potentially manage and operate the Casino on behalf of HKE.

42. In addition, the Management Agreement provided that there was to be a Transitional, Observation and Review Period (§ 4 of the Management Agreement) during which: (1) TMC was to observe and review the operation of the Casino and consult with HKE regarding the staffing, policies, and procedures, and all other matters relating to the operations and management of the Casino; (2) TMC and HKE would consult, on an anticipated daily basis, as to the needs of HKE and the Casino regarding legal compliance and best practices; (3) TMC shall prepare written reports, to be provided to the Commission, regarding TMC's assessment of HKE's and the Casino's compliance with the Act; (4) TMC was to prepare and deliver to HKE a written assessment and implementation plan aimed at expeditiously bringing HKE and the Casino into complete legal and regulatory compliance and maximizing the potential economic resources of HKE and the Casino; and (5) HKE was to determine whether it would retain TMC as to whether it was to be retained to operate the Casino.

43. In a February 26, 2015 letter from the Commission to counsel for HKE, the Commission required §4.3 of the Management Agreement to be modified so that TMC would prepare written reports, to be provided directly to the Commission, regarding TMC's assessment of HKE's and the Casino's compliance with the Tinian Gaming Act ("Act") and the rules and regulations promulgated thereto, as well as to provide oral reports and answer questions of the Commission as to the foregoing.

44. In addition, the February 26, 2015 Commission letter required, notwithstanding the language of the Management Agreement, that during the Transitional, Observation and Review Period, the Management Agreement would be interpreted as follows: (1) TMC, during the transitional period, be afforded full access to all information, including access to all bank accounts, books and records, including those maintained outside of Tinian by Mega Stars (the parent of HKE) and other HKE affiliates, needed to determine how the Casino is operated, how credit is authorized, and how the Casino's revenues are calculated and handled; (2) TMC would have full authority to take such actions, consistent with best practices in the gaming industry, as it deemed necessary to remediate the compliance issues identified in the Executive Summary; and (3) TMC would have full authority to initiate and participate in regular and independent contacts with the Commission to discuss TMC's recommendations to bring HKE into compliance with the Act.

45. HKE and TMC agreed to the Commission's changes and interpretations, and this was communicated to the Commission's counsel by HKE's counsel by email dated February 26, 2015. The revised §4.3 was incorporated into the final executed Management Agreement.

46. The Management Agreement is currently the subject of a commercial arbitration pending before the American Arbitration Association bearing Case No. 01-15-004-8522.

47. The parties to the aforementioned arbitration are TMC and HKE.

48. CSHL was not a signatory to the Management Agreement and, hence, is not a party to the aforementioned arbitration.

49. The individuals performing services pursuant to the Management Agreement on behalf of TMC had substantial legal, financial, and regulatory experience as relates to casinos.

50. TMC attempted to perform the services contemplated by the Management Agreement until same was improperly and illegally terminated by HKE.

51. The Management Agreement was effective upon its execution ("Execution Date").

52. The services to be performed by TMC pursuant to the Management Agreement would commence following the receipt by TMC of all approvals necessary to perform the services contemplated or at such other time as the parties agree ("Commencement Date").

53. The Commencement Date would begin a six month "Initial Term."

54. HKE was required to pay management fees to TMC for the entire Initial Term regardless of termination of HKE's services.

55. In a letter dated April 27, 2015, HKE stated that it had unilaterally determined that it would "cease implementation" of the Management Agreement.

56. TMC responded to HKE by indicating that the termination was not permitted.

57. TMC made demand of all monies to which it was entitled pursuant to § 9 of the Management Agreement.

58. Despite such demand, HKE has failed and refused to pay same.

59. The decision by HKE to improperly terminate the Management Agreement was with the acquiescence or at the direction of CSHL.

60. CSHL is in the midst of obtaining, or has obtained, permission by the Commission to own or operate the Casino.

61. CSHL's actions, by and through HKE, as relates to the Management Agreement, were merely an attempt to hold the Commission at bay pending CSHL's licensure and acquisition or operation of the Casino.

62. Stemming from activities occurring before the Engagement Agreement and Management Agreement, a federal grand jury indicted HKE and alleged that it failed to file currency transaction reports for casinos, as required by the Bank Secrecy Act, that involved more than $10,000.00 in cash.

63. It was alleged that HKE did not fully identify and disclose all individuals whose gambling activities should have triggered a currency transaction report for casinos.

64. It was specifically alleged that between October 1, 2009 through April 25, 2013, Defendant failed to report over $138,000,000.00 in reportable cash transactions emanating from 3,640 cash transactions.

65. As a result of the foregoing, HKE was indicted for one count of conspiracy for failure to file transaction reports in violation of 18 U.S.C. § 371 and 31 U.S.C. §§ 5313(a), 5322(b), 5324(a)(1) and 5324(d)(2); 155 counts of failure to file transaction reports in violation of 31 U.S.C. §§ 5313(a) and 5322(b); one count of failure to file pursuant to 31 U.S.C. §§ 5313(a) and 5322(b); and one count of failure to maintain an effective anti-money laundering program in violation of 31 U.S.C. §§ 5318(h) and 5322(b).

66. Pursuant to a Non Prosecution Agreement, HKE was to forfeit $3,036,969.12.

67. Additionally, the U.S. Financial Crimes Enforcement Network imposed a $75,000,000.00 civil penalty against HKE for "willful and egregious violations of the Bank Secrecy Act."

COUNT I-CONTRACTUAL CLAIM PURSUANT TO ENGAGEMENT AGREEMENT

68. GCA competently and timely performed services, expended monies, and otherwise incurred fees and costs as per its obligations pursuant to the Engagement Agreement.

69. GCA duly submitted to HKE invoices detailing the services, expenditure of monies, and the incurrence of fees and expenses pursuant to the Engagement Agreement.

70. Despite repeated demands, HKE has failed and refused to pay the afore described invoices in their entirety: HKE made partial payment; therefore monies remain due and owing from HKE to GCA.

71. The failure to pay the invoices in a violation of HKE's contractual obligations to Plaintiff.

72. The amount due from HKE to GCA, pursuant to the Engagement Agreement, is in excess of $75,000.00.

WHEREFORE, GCA demands judgment against HKE for the following:

    A.    Damages.

    B.    Interest.

    C.    Costs of suit.

    D.    Attorney's fees to the extent allowed.

    E.    All other relief that this Court deems just and equitable.

COUNT II-QUANTUM MERUIT PURSUANT TO ENGAGEMENT AGREEMENT

73. GCA and TMC repeat each and every allegation of ¶¶ 1-72 of this Complaint and incorporate the same as if herein set forth at length.

74. The reasonable value of GCA's services, expenditures, and fees and costs have been demanded from HKE; said demand was in excess of $75,000.00.

75. Despite such demand, HKE has failed and refused to pay GCA the reasonable value of its services, expenditures, fees and costs.

WHEREFORE, GCA demands judgment against HKE for the following:

A.  Damages.

B.  Interest.

C.  Costs of suit.

D.  Attorney's fees to the extent allowed.

E.  All other relief that this Court deems just and equitable.

### COUNT III-INTERFERENCE WITH CONTRACTUAL RELATIONS

76. GCA and TMC repeat each and every allegation of ¶¶ 1-75 of this Complaint and incorporate the same as if herein set forth at length.

77. At all times relevant hereto, there was a Management Agreement in place which constituted a contractual relationship by and between TMC and HKE.

78. CSHL had knowledge of the Management Agreement, as detailed above, because it was in attendance at the Seattle Summit with the Commission; more specifically, certain correspondence from the Commission as relates to the Casino was sent directly to CSHL which was also indicative of its involvement and knowledge of the Management Agreement.

79. As detailed above, CSHL by controlling, indirectly or indirectly, HKE as relates to the Management Agreement, and in order to hold the Commission at bay while CSHL finalized its plans to own or operate the Casino, intentionally induced HKE to breach the Management Agreement.

80. As a result of the foregoing actions by CSHL, HKE breached the Management Agreement and TMC suffered damages as a result.

WHEREFORE, TMC demands judgment against CSHL for the following:

A.  Damages.

B.  Punitive damages.

  C. Interest.

  D. Costs of suit.

  E. Attorney's fees to the extent allowed.

  F. All other relief that this Court deems just and equitable.

COUNT IV-INTEREFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

  81. GCA and TMC repeat each and every allegations of ¶¶ 1-80 of this Complaint and incorporate same as if herein set forth at length.

  82. The Management Agreement, if abided by, would have provided to TMC prospective economic advantages.

  83. As detailed above, CSHL had knowledge of the Management Agreement.

  84. CSHL by, directly or indirectly, controlling HKE, caused HKE to breach the Management Agreement.

  85. The conduct of CSHL was undertaken for the sole purpose of harming TMC.

  86. The conduct of CSHL was wrongful or improper, independent of the interference with the Management Agreement, in that TMC was fraudulently induced into entering the Management Agreement when the entry of the Management Agreement was merely an artifice to hold the Commission at bay while CSHL finalized its plans to own or operate the Casino and while CSHL exercised economic pressure on HKE as a result of HKE's problems with the Commission and the Federal Authorities.

  87. As a result of the foregoing, TMC was damaged.

WHEREFORE, TMC demands judgment against CSHL for the following:

  A. Damages.

  B. Punitive Damages.

C.      Interest.

D.      Costs of suit.

E.      Attorney's fees to the extent allowed.

F.      All other relief that this Court deems just and equitable.

/s/ *Fredric L. Shenkman*
Fredric L. Shenkman (FS 4102)
COOPER LEVENSON, P.A.
1125 Atlantic Avenue - 3rd Floor
Atlantic City, NJ 08401
Telephone: (609) 572-7330
Facsimile: (609) 572-7331
fshenkman@cooperlevenson.com
Attorney for Plaintiffs

Dated: September 14, 2016

CLAC 3717301.2